UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MARK CAPKOVIC, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Case No. 4:12-CV-1129-CAS-NAB |
| | ) |
| CAROLYN W. COLVIN[1], | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

## REPORT AND RECOMMENDATION

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Plaintiff Mark Capkovic's application for disability insurance benefits for a closed period of disability between April 23, 2005 through August 30, 2007. Capkovic alleges disability due to memory problems, intermittent hearing problems related to previous head injury, surgery, and spinal meningitis. (Tr. 204.) This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) for a Report and Recommendation. [Doc. 6.]

**I.    Procedural Background**

Capkovic applied for disability insurance benefits on July 26, 2006. (Tr. 199-202.) The Social Security Administration ("SSA") denied Capkovic's claim and he timely filed a request for hearing before an administrative law judge ("ALJ"). (Tr. 75-78, 81) The SSA granted Capkovic' request and the hearing took place on March 6, 2008. (Tr. 83-84, 494-538.) The ALJ

---

[1] At the time this case was filed, Michael J. Astrue was the Commissioner of Social Security. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name and the Court may order substitution at any time. *Id.* The Court will order the Clerk of Court to substitute Carolyn W. Colvin for Michael J. Astrue in this matter.

issued a written decision on June 3, 2008, upholding the denial of benefits. (Tr. 58-67.) Capkovic requested review of the ALJ's decision from the Appeals Council. (Tr. 112.) On April 29, 2010, the Appeals Council granted Capkovic's request for review and remanded Capkovic's claim to the ALJ to obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Capkovic's occupational base and to determine whether Capkovic has acquired any skills that are transferrable to other occupations. (Tr. 73-74.)

The ALJ held a supplemental hearing on August 5, 2010. (Tr. 35-51.) The ALJ issued a written decision again upholding the denial of benefits on September 23, 2010. (Tr. 17-30.) Capkovic requested review of the ALJ's decision from the Appeals Council. (Tr. 11.) On April 26, 2012, the Appeals Council denied Capkovic's request for review. (Tr. 1-4.) The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Capkovic filed this appeal on June 22, 2012. [Doc. 1.] The Commissioner filed an Answer. [Doc. 10.] Capkovic filed a Brief in Support of the Complaint. [Doc. 19.] The Commissioner filed a Brief in Support of the Answer. [Doc. 24.]

## II.     The ALJ's Decision

The ALJ found that Capkovic met the insured status requirements of the Social Security Act through December 31, 2014, engaged in substantial gainful activity from October 15, 2005 through April 13, 2006, and thus was not disabled during that period. (Tr. 19, 21.) The ALJ determined that Capkovic was not disabled prior to October 15, 2005, based upon the absence of a disability lasting twelve months in duration. (Tr. 21.) Therefore, the ALJ only considered the period from April 14, 2006 to August 30, 2007 as Capkovic's period of closed disability. (Tr. 21.) The ALJ found, however, that even if he considered the entire period since April 25, 2005, the record did not establish that Capkovic was disabled or unable to engage in other work

2

existing in significant numbers. (Tr. 21.) The ALJ determined that Capkovic had the combined severe impairments of seizure disorder and organic mental disorder, but he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21.) The ALJ found that during the alleged closed period of disability Capkovic had the residual functional capacity to (1) lift and carry more than 20 pounds occasionally and lift less than 10 pounds frequently, (2) sit six hours in an eight hour workday, (3) stand and/or walk six hours in an eight hour workday, (4) occasionally stoop and crouch, (5) occasionally use ramps or stairs, (6) push and pull twenty pounds occasionally and less than 10 pounds frequently, and (7) understand, remember, and follow simple instructions and directions in a routine work setting. (Tr. 22.) The ALJ also found that Capkovic had to avoid unprotected elevations, dangerous moving machinery, and commercial driving. (Tr. 22.)

Based on the RFC, the ALJ determined that Capkovic was unable to perform any past relevant work and was approaching advanced age. (Tr. 28.) The ALJ also determined that based on Capkovic's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform. (Tr. 28.) Finally, the ALJ concluded that Capkovic was not under a disability as defined by the Social Security Act from April 23, 2005 through August 30, 2007. (Tr. 29.)

### III. Administrative Record

The following is a summary of the administrative record before the ALJ:

#### A. Hearing Testimony

During the first administrative hearing, the ALJ heard testimony from Capkovic, Mona Capkovic, his wife, and vocational expert Jeffrey Magrowski. (Tr. 494-538.) At the second

administrative hearing, the ALJ heard testimony from Capkovic and vocational expert Gary Weimholt. (Tr. 35-51.)

### 1. Capkovic's Testimony

Capkovic testified that he graduated from high school and a computer technical school. (Tr. 502.) He also attended college, but did not graduate. (Tr. 502.) Capkovic worked at Crane National Vendors from 1978 to 2005. (Tr. 503.) During most of his tenure at Crane, Capkovic was a computer supervisor maintaining the computer systems twenty four hours a day, seven days a week. (Tr. 504.) He also managed up to eleven employees when he was a supervisor. (Tr. 505.) Capkovic distributed problems to the programmers. (Tr. 40.) Capkovic testified that he had to lift boxes of forms, paychecks, and credit reports that weighed between 25 to 50 pounds. (Tr. 41.) During his last two years of employment, he was a computer operator and was responsible for all of the batch and online processing. (Tr. 504.) Capkovic was in charge of purchasing and stocking items. (Tr. 518.) Capkovic's job required a lot of multi-tasking. (Tr. 517.)

In April 2005, Capkovic had brain surgery because he was having blackout spells and losing consciousness despite using medication. (Tr. 505.) He testified that he missed work between April 2005 and October 2005. (Tr. 506.) Capkovic returned to work at Crane between October 2005 and March or April 2006. (Tr. 507.) Capkovic was then asked to leave his job at Crane in March or April 2006. (Tr. 515.) Capkovic began working at his church doing maintenance work in August 2007. (Tr. 516.)

Capkovic testified that after his surgery, he had memory problems, which continued into the present. (Tr. 509.) Capkovic could not remember dates, names, or locations. (Tr. 510.) His doctors would not allow him to drive. (Tr. 510.) Capkovic stated he could not maintain his

4

balance and he would fall down repeatedly. (Tr. 511.) Capkovic became dizzy walking and he fell asleep unexpectedly. (Tr. 511-512.)

Capkovic testified that upon his return to work, he was unable to remember the details required to do his job, including forgetting how to run the printer. (Tr. 512- 514.) If Capkovic had written instructions, he would follow them. (Tr. 513.) Capkovic stated, prior to his surgery, he had everything memorized and he was the person in charge of all documentation. (Tr. 514.) When he returned to work at Crane after his surgery, his department had downsized and he was the only employee left. (Tr. 514.) Capkovic testified that it was a severe struggle when he returned to work. (Tr. 523.) His job was difficult due to his memory problems. (Tr. 524.) At the time of the hearing, Capkovic no longer had the balance and fatigue issues. (Tr. 525.) Capkovic testified that he worked at Crane for 27 years and has consistently worked since 1972. (Tr. 523, 526.)

### 2. Mona Capkovic's Testimony

Mona Capkovic testified that she has been married to Capkovic for 27 years. (Tr. 529.) Ms. Capkovic testified that after Capkovic acquired bacterial spinal meningitis, he did not know how to do anything and his short-term memory was non-existent. (Tr. 530.) Ms. Capkovic stated that Capkovic was "lost in everyday life." (Tr. 531.) She testified that he did not remember how do things and he had a tendency to get lost. (Tr. 531.) She did not feel that he was "physically safe enough to work." (Tr. 531.) Ms. Capkovic testified that he slept all of the time. (Tr. 532.) She also testified that when he returned to work at Crane, he would come home upset, because he was being yelled at by his supervisor. (Tr. 533.)

5

### 3. Vocational Expert Jeffrey Magrowski's Testimony

VE Magrowski testified that Capkovic's past work as a computer operator and a manager or supervisor of computer operations was skilled work. (Tr. 536.) The computer operator job generally has a light exertional level and the supervisor or manager job is more of a sedentary job. (Tr. 536.) He stated that the jobs were at a medium exertional level as Capkovic performed them. (Tr. 536.) Capkovic's current job as a cleaner is medium and unskilled generally and as he performed it. (Tr. 536.)

### 4. Vocational Expert Gary Weimholt's Testimony

VE Weimholt testified that Capkovic's work as a manager of computer operations was a sedentary, highly skilled job. (Tr. 41.) A supervisor of computer operations job is classified as a light, skilled job (Tr. 41.) A computer operator job is also classified as a light, skilled job. (Tr. 41.) The jobs as Capkovic actually performed them had a medium exertional level. (Tr. 42.) A hypothetical individual with Capkovic's work experience and education who could (1) lift and carry more than 20 pounds occasionally and lift less than 10 pounds frequently, (2) sit six hours in an eight hour workday, (3) stand and/or walk six hours in an eight hour workday, (4) occasionally stoop and crouch, (5) occasionally use ramps or stairs, (6) push and pull twenty pounds occasionally and less than 10 pounds frequently, and (7) understand, remember, and follow simple instructions and directions in a routine work setting, and (8) had to avoid unprotected elevations, dangerous moving machinery, and commercial driving would be unable to perform Capkovic's past relevant work. (Tr. 44.) Such a hypothetical individual who was also approaching advanced age could obtain work as a parts assembler, inspector, hand packer, and cashier. (Tr. 45.)

VE Weimholt testified that assuming the above hypothetical individual had occasional limitations in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods and the ability to interact appropriately with the public, that individual would be unable to work as a parts assembler, inspector, hand packer, or cashier or any other job. (Tr. 48.) He also testified that the hypothetical individual would be unable to perform the aforementioned jobs or any other jobs if the individual was also limited by bouts of loss of balance and needed assistance moving between levels or needed two to four unscheduled breaks during the average work week to rest due to fatigue during which he would be unable to do any work. (Tr. 48.)

   **B.**   **Medical Records**

Capkovic was treated at the Washington University Adult Epilepsy Center between October 2003 and August 2006. (Tr. 395-424, 451-468, 469-493.) Dr. A. James Fessler, III, treated Capkovic three times between October 2003 and May 2004 for recurrent seizures due to a fall resulting in a head injury. (Tr. 453.) Dr. Fessler diagnosed Capkovic with a seizure disorder and prescribed anti-seizure medication of Tegretol XR and Keppra. (Tr. 454, 456, 459.) Dr. Fessler also imposed the following limitations on Capkovic: he could not drive, operate heavy machinery, swim alone, take baths, climb ladders, work at heights, or cook over open flame unless free of unconsciousness impairing events for 6 months. (Tr. 454, 456, 459.) On January 12, 2004, an MRI of Capkovic's brain revealed encephalomalacia[2], which may have been caused by his previous head injury. (Tr. 457.)

---

[2] Encephalomalacia is an abnormal softness of the cerebral parenchyma often due to ischemia or infarction. Stedman's Medical Dictionary 587 (27th ed. 2000).

7

Dr. Timothy Lynch treated Capkovic for his seizures between August 2004 and August 2005. On October 6, 2004, Capkovic had a brain PET[3] scan performed, which revealed moderate hypometabolism in the antero-inferior left frontal lobe inferiorly and the majority of the left temporal lobe that correlates with areas of gliosis[4] shown on the January 2004 MRI. (Tr. 462.) On October 10, 2004, an electroencephalograph[5] ("EEG") revealed that he had 2 seizures occurring in the left temporal lobe. (Tr. 465.)

On April 22, 2005, Dr. Joshua Dowling performed a lobectomy and amygdala hippocampectomy on Capkovic. (Tr. 265-267.) On April 26, 2005, Capkovic was discharged from the hospital, but was re-admitted to the hospital on May 3, 2005 due to meningitis and discharged on May 10, 2005. (Tr. 261-262.)

Dr. Dowling examined Capkovic for post-surgical follow-up between May and July 2005. On May 23, 2005, Dr. Dowling noted that Capkovic was showing slow improvement in his cognitive deficits, although he was having some improvement. (Tr. 387.) On June 20, 2005, Dr. Dowling noted that Capkovic showed significant improvement in speech, but Capkovic still had serious difficulties with short-term memory, which precluded him from returning to work. (Tr. 386.) Dr. Dowling observed that Capkovic was alert, oriented with clear and fluent speech and no focal, motor, or sensory deficits. (Tr. 386.) During Capkovic's July 21, 2005 visit, Dr. Dowling noted that Capkovic was steadily improving, but had still not achieved the level of cognitive recovery that would allow him to return to work. (Tr. 385.)

---

[3] PET is the acronym for positron emission tomography, which uses gamma ray detectors to produce maps of the metabolic activity of selected organs. Attorney's Medical Deskbook § 21.12(4th ed. 2012). A PET scan can also outline tissue structures invisible to x-ray and reveal areas of altered organ function. *Id.*

[4] Gliosis is an overgrowth of the astrocytes in an area of damage in the brain or spinal cord. Stedman's Medical Dictionary 750 (27th ed. 2000).

[5] An electroencephalograph is the system for recording the electric potentials of the brain derived from electrodes attached to the scalp. Stedman's Medical Dictionary 575 (27th ed. 2000).

On June 3, 2005, Dr. Robert Fucetola, a neuropsychologist examined Capkovic to assess his cognitive functioning. (Tr. 371-375.) Capkovic reported that he had variable short-term memory and significant word-finding problems, since his surgery although it had recently improved. (Tr. 371.) Capkovic denied reading or visual changes (Tr. 371.) The neuropsychological data overall revealed severe deficits in anterograde memory for verbal information and primary language functions. (Tr. 374.) Dr. Fucetola also noted mild difficulties in verbal abstraction tasks and mildly impaired mental flexibility. (Tr. 374.) Dr. Fucetola opined that Capkovic's basic working memory and attention, concept formation, repetition, oral reading, and visual anterograde memory functions were normal. (Tr. 374.) Dr. Fucetola concluded that Capkovic demonstrated severe residual anterograde amnesia for verbal information and anomia.[6] (Tr. 374.)

On August 22, 2005, Dr. Lynch examined Capkovic. (Tr. 472-473.) Dr. Lynch noted that Capkovic was virtually baseline in terms of his aphasia and that Capkovic reported being seizure free. (Tr. 473.) Dr. Lynch noted that Capkovic's attention, speech, language, mood, and flow of thought were normal. (Tr. 472.) Dr. Lynch also noted that Capkovic's gait and walking were normal. (Tr. 473.)

Capkovic underwent outpatient occupational, physical, and speech therapy at the Rehabilitation Institute of St. Louis. (Tr. 292-369.) Capkovic was discharged from the outpatient therapy on September 27, 2005. (Tr. 295.) The discharge summary indicated that Capkovic was ambulating without an assistive device, bathroom accessories, or other equipment. *Id.* The discharge summary also noted that Capkovic did not report any pain and all of his goals had been met. *Id.*

---

[6] Anomia or nominal aphasia is aphasia where the principal deficit is difficulty in naming persons or objects seen, heard or felt due to lesions in various portions of the language area. Stedman's Medical Dictionary 91, 110 (27th ed. 2000).

On September 30, 2005, Dr. Nichole Schwarze, a neuropsychologist, evaluated Capkovic for a follow-up neuropsychological assessment. (Tr. 376-379.) Capkovic reported that he had not had any seizures and other than problems remembering peoples' names, he had no other cognitive changes as a result of his surgery. (Tr. 376.) Dr. Schwarze found that Capkovic's overall intellectual abilities fall within the average range. (Tr. 378.) She opined that Capkovic still experienced persistent, severe anomia, which is apparent even in casual conversation. (Tr. 378-379.) A comparison of his September evaluation with the June 2005 evaluation showed that Capkovic demonstrated clinically significant improvement in oral language and verbal abstract reasoning. (Tr. 379.) Dr. Schwarze opined that Capkovic's prognosis to return to work was guarded given the continued severity of his anomia, but that it was possible for him to return to work successfully with a supportive employer if his job did not require significant oral language skills. (Tr. 379.)

On October 10, 2005, Dr. Dowling examined Capkovic and found that Capkovic had shown substantial improvement in his postoperative deficits. (Tr. 394.) Dr. Dowling opined that although Capkovic would continue to improve, "it was reasonable for him to try to return to his previous employment." (Tr. 394.)

On February 20, 2006, Capkovic visited Dr. Dowling for post-surgical follow-up. (Tr. 393.) Capkovic reported that he had returned to work since his last visit in October and he had been working well since then and fulfilling the duties of his jobs. *Id.* Dr. Dowling noted that Capkovic had been seizure free for ten months and his cognitive function was returning to baseline. *Id.* Dr. Dowling determined that he only needed to see Capkovic in the future on an as needed basis. *Id.*

Capkovic visited Dr. Darla Darby for follow-up after his surgery between August 2006 and February 2007. (Tr. 474-481.) Dr. Darby noted that Capkovic had remained seizure free since his surgery in April 2005. (Tr. 474, 476, 479.) Neurological examination showed that Capkovic's attention, speech, language, mood and flow of thought were normal. (Tr. 475, 477, 480.) Capkovic's coordination was primarily normal, with a mildly unsteady Tandem gait noted. (Tr. 475, 477, 480.)

On October 10, 2006, Dr. J. Spence, an SSA disability medical consultant, completed a Psychiatric Review Technique and Mental RFC Assessment regarding Capkovic. (Tr. 431-445.) Dr. Spence noted that Capkovic had status post traumatic brain injury and an anterior temporal lobectomy and amygdala hippocampectomy. (Tr. 432.) Dr. Spence found that Capkovic had mild restrictions in daily living and moderate restrictions in maintaining social functioning and concentration, persistence, or pace. (Tr. 439.) He also found that Capkovic was moderately limited in the ability to understand, remember, and carry out detailed instructions maintain attention and concentration for extended periods; and interact appropriately with the general public. (Tr. 443-444.)

Capkovic visited Dr. Samiya Rashid in October 2007 and February 2008, due to the recurrence of seizures after attempts to wean him off of the Kreppa medication. (Tr. 482, 486.) Dr. Rashid noted at the February 2008 visit that Capkovic had had seven seizures since his Keppra medication was re-started. (Tr. 485.) She also noted that his neurological examination, motor skills, coordination, and gait were normal during both examinations. (Tr. 485.)

**IV. Discussion**

Capkovic alleges three errors on review. Capkovic asserts that the ALJ should have found that his six month return to work was an unsuccessful work attempt and should be

considered in calculating Capkovic's period of disability.  Next, Capkovic states that the RFC was not supported by medical or testimonial evidence; therefore, the hypothetical question posed to the VE was incomplete.  Capkovic contends that the RFC and hypothetical question to the VE should have included the limitations found by Dr. Spence.  The Commissioner asserts that the ALJ's decision is supported by substantial evidence in the record as a whole.

A.   **Standard of Review**

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A).

The Social Security Administration uses a five-step analysis to determine whether a claimant seeking disability benefits is in fact disabled.  20 C.F.R. § 404.1520(a).  First, the claimant must not be engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a).  Second, the claimant must establish that he or she has an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities. 20 C.F.R. § 404.1520(c). Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the appendix to the applicable regulations. 20 C.F.R. § 404.1520(d).  Fourth, the claimant must establish that the impairments prevents him or her from doing past relevant work. 20 C.F.R. § 404.1520(f).  At step five, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity to perform a significant number of jobs in the national economy.  *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000).  If the claimant satisfies all of the criteria under the five step evaluation, the ALJ will find the claimant to be disabled. 20 C.F.R. § 404.1520(a)(4)(v).

The court reviews decisions of the ALJ to determine whether the decision is supported by substantial evidence in the record as a whole. *Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision. *Id.* Therefore, even if this court finds that there is a preponderance of evidence against the weight of the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. *Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

1. The findings of credibility made by the ALJ;

2. The education, background, work history, and age of the claimant;

3. The medical evidence given by the claimant's treating physicians';

4. The subjective complaints of pain and description of the claimant's physical activity and impairment;

5. The corroboration by third parties of the claimant's physical impairment;

6. The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

7. The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

B.     **Unsuccessful Work Attempt**

A person who is engaging in substantial gainful activity ("SGA") is not eligible to receive disability insurance benefits. 20 C.F.R. § 404.1571. "For SGA determination purposes, substantial work, may under certain conditions be disregarded if it is discontinued or reduced to the non-SGA level after a short time because of the person's impairment or the removal of special conditions related to the impairment that are essential to the further performance of work." SSR 05-02, 2005 WL 568616 at *2 (February 28, 2005). This is known as an unsuccessful work attempt. Unsuccessful work attempts can be used in initial disability cases. *Id.*

Before the unsuccessful work attempt, there must be a significant break in the continuity of work before the claimant can be considered to have begun a work attempt that proved unsuccessful. *Id.* Work is discontinued if the claimant (1) was out of work at least 30 consecutive days or (2) was forced to change to another type of work or another employer. 20 C.F.R. § 404.1574(c)(2). SGA-level work lasting more than six months cannot be an unsuccessful work attempt regardless of why it ended or was reduced to non-SGA level. 20 C.F.R. § 404.1574(c)(5). If the work effort lasted between three and six months, it will be considered an unsuccessful work attempt if it ended or was reduced below SGA levels, within six months because of the impairment or because of the removal of special conditions which took into account the impairment and permitted claimant to work and (1) claimant was frequently absent from work because of impairment; (2) claimant's work was unsatisfactory due to impairment; (3) work was during temporary remission of impairment; and (4) claimant

worked under special conditions that were essential to his performance and those conditions were removed. 20 C.F.R. § 404.1574(c)(4)(i)-(iv).

Based on the evaluation of the record as a whole, the undersigned finds that substantial evidence supports the ALJ's determination that Capkovic's return to work between October 2005 and April 2006 was not an unsuccessful work attempt. Capkovic does not meet the statutory requirements to assert an unsuccessful work attempt. First and foremost, Capkovic's work did not end because of his impairment, rather he was laid off, because his company was downsizing. Capkovic has also failed to prove that he worked under special conditions that allowed him to work and then such conditions ended. Therefore, Capkovic cannot meet the durational requirements to allege disability for the time period between October 2005 and April 2006. See 42 U.S.C. § 4167(i)(1)(A) (disability must be expected to result in death or last for 12 months). The ALJ's determination that the time period between April 2005 and October 2005 fails to meet the twelve month durational time period for disability benefits is also supported by substantial evidence in the record. *Id.*

### C. Residual Functional Capacity

Capkovic contends that the RFC is not supported by medical or testimonial evidence. The undersigned disagrees. RFC is defined as what the claimant can do despite his or her limitations, and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545. The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis.[1] SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own

---

[1] A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. SSR 96-8p, 1996 WL 374184, at *1.

15

descriptions of his limitations. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. *See Lauer*, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

In this case, Capkovic asserts that his testimony regarding his symptoms and the limitations found by Dr. Spence demonstrate that the ALJ's RFC determination is not supported by substantial evidence. While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). A claimant's subjective complaints may not be disregarded solely because the objective medical evidence does not fully support them. *Id.* The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility and complaints. *Id.* The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

*Id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints. *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005).

The undersigned agrees with the ALJ's determination that Capkovic's credibility is enhanced by his long and substantial work record. "[A] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Nunn v. Heckler*, 732 F2d 645, 648 (8th Cir. 1984.) The undersigned notes however, that Capkovic's testimony directly contradicts the information that he gave to his doctors and the medical evidence in the record. The medical evidence shows that Capkovic made substantial improvements in his physical and cognitive abilities such that he was allowed to return to work, which he was eager to do in October 2005. Furthermore, although Capkovic testified that returning to work was a severe struggle, he told Dr. Dowling that he was fulfilling the duties of his job well and he had been working well. (Tr. 393.) Capkovic does not dispute this evidence. There is no evidence of a setback in Capkovic's medical treatment until July 2007, when his doctors attempted to wean him off of his Keppra medication. (Tr. 482.) Also, Capkovic suddenly was able to begin work again in August 2007, which detracts from his credibility. There is no evidence that his medical condition improved substantially between July and August 2007.

Finally, the ALJ properly considered Dr. Spence's opinion. The ALJ accorded little weight to Dr. Spence's findings, because they contradicted the medical evidence of record and

were not based on a treatment or examination of Capkovic. "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if [the conclusions] are inconsistent with the record as a whole." *Id.* The undersigned finds that the ALJ's determination is supported by substantial evidence. Although the Court should consider all of the medical opinions in the record, the opinions of non-examining physicians normally do not constitute substantial evidence. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) (*citing Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003)). Dr. Spence's findings contradict the other medical evidence in the record, were not derived from treatment or examination of Capkovic, and were based upon a review of the record only until October 2006. Therefore, the ALJ did not err in assessing little weight to his opinion.

Finally, Capkovic asserts that the hypothetical question proposed to the VE was incomplete. The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (*citing Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993)). The undersigned has already found that the RFC determination by the ALJ is supported by substantial evidence. Therefore, the ALJ did not commit error by excluding the limitations found by Dr. Spence.

**V.     Conclusion**

Based on the foregoing, the undersigned recommends that the ALJ's decision be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief which Plaintiff seeks in his Complaint and Brief in Support of Complaint be **DENIED**. [Doc. 1, 19]

**IT IS FURTHER RECOMMENDED** that Judgment be entered in favor of the Commissioner.

**IT IS FURTHER ORDERED** that the Clerk of Court shall substitute Carolyn W. Colvin for Michael J. Astrue in the court record of this case.

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this 30th day of August, 2013.

    /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE